Peter Koenigs, Firebat and Boggs. I'm here on behalf of Appellant Tau-Ken Temir, Tau-Ken Sumruk and the Ministry of the Republic of Kazakhstan and actually all I'm going to do in my opening argument is what to answer your question and the question was you just issued the decision in Oman fasteners and does it apply and in what way so that's all I'm going to do because it actually covers much of our case anyway. In Oman fasteners they found that any infraction as far as submitting the questionnaire response was minor. You found, the court found. And also that the adverse inferences imposed were draconian under the circumstances. Why aren't the facts here far different? In Oman the party started submitting all of its documents before the deadline and had uploaded at least as far as I read almost all of them except for one or two and finish that within 15 minutes and so under no circumstances could you ever consider that really a failure to miss the deadline. They tried it was very very minor. Here you got two extensions and on the day it was due you knew that morning that you were going to have problems but yet you didn't file an extension request till sometime that afternoon at 3 or 4 and by operation of their regulation if it didn't respond you knew you got an automatic extension at 8 till 830 but by 830 you still hadn't tried to upload anything. You didn't start uploading anything until 10 and I don't think you finished until 3 and then you never uploaded the proprietary documents. Those all seem to me to be very distinguishable from the very very minor oversight in Oman. I mean why isn't that enough to distinguish this case from Oman? Well in Oman they didn't file, the party did not file an extension request in a timely way and we did. Yes but you didn't meet the deadline given by your extension request. We filed an extension for one day. I know and you knew and it was your third, right? You'd already been given two and you knew that if Commerce didn't address it by operation of their regulation you got an automatic extension to the next morning. Oman relied on the fact that if they had filed that they would have gotten the 830 deadline and not been untimely at all. You didn't meet the 830 deadline. You didn't even attempt to meet the 830 deadline. Oh we attempted. No but you didn't do anything with Commerce. Can I clarify something here? My understanding, please correct me if I'm wrong, is that some material was uploaded before the 830 deadline. Yeah there was an attempt. I thought some of it was uploaded, am I mistaken about that? What was sent, we tried to upload it and we still got a rejection and actually we filed for the record notice of that rejection and then we did complete by, I think it was around 1040, an hour and a half after 830. But why did you start, I mean you knew this was going on in the evening and maybe there was stuff going on but according to what you say you started to do this uploading at like 5 o'clock, 5 a.m. Why didn't you start doing it at 10 p.m. the night before once you knew that this was. Because there were problems with file corruption and making them searchable and that was the the core problem. We'd received from TKT in the prior questionnaire responses, we received them and they were fine and everything went smoothly. So when we received their final full version the morning of, I think it was like a close to 11 o'clock that morning, at that point the feeling from the past experience with them was always good. But then when we started working through. Why do you think it was appropriate to wait until 11 the day it was due to receive the documents? That doesn't seem to be to be a very wise practice. Well it was. Especially after you'd already been given two extensions for this production. Well we, TKT was working as fast as possible. These questionnaire responses are absolutely huge. They've actually not uncommon for them to go right up to the deadline. And so that's. Not uncommon for who? For all people that have this issue or for your clients or when you say it's not uncommon? Pardon? What is, when you say it's not uncommon, not uncommon for who? Oh just for many cases. And actually if you looked at the time, Commerce said you should start your questionnaire response filing by 4 p.m. And that was from Commerce's experience and observations of when people were finally ready to file. It was later that after they experienced, viewed what was happening some years later, that they changed it to 10 a.m. as a best practice. So we actually thought we're in best practice. We thought we would be ready to go by 4 o'clock and by 340 it was clear that we could not deal with these file corruption issues. Okay can I, your time is running, so let me ask you a basic question. You were going to address OMON. Is your understanding of OMON that it deals exclusively with the imposition of an AFA rate? So your case, and do you also agree that your case presents kind of a two-step, which is even if you get rid of the AFA rate, hypothetically, you would still be left with facts available because your submission was rejected and that would be something less draconian that Commerce could do. So is it your view, one, that OMON only covers the AFA problem, allegedly or possibly, and two, that we would also therefore need to decide ourselves, if we agreed that the AFA rate was improper, what we do at step two, which is on the facts available, which is a different standard than the AFA rate. Of course we're arguing the questionnaire responses should have been accepted and then if you go to OMON, if they're not accepted, adverse facts are inappropriate under the circumstances. That's adverse facts, but what about, okay, so even if we were to say hypothetically under OMON they couldn't have applied this advert facts percentage, we're still left with the case where they're going to have to apply something and your filings were still rejected. It wasn't really an issue in OMON because of the injunction. It was an issue in OMON until Judge Miller Baker said no and you have to, he also said you have to accept the filings and OMON, in my read, didn't go that far because it didn't need to because in the circumstances of that case they were already down to a zero percent rate. But in this case, what is your view of what happens if we apply OMON? How far does that take you in terms of where you want to get? Well the court in OMON said you've got to accept the questionnaire responses. Did it really? Well that, and then Commerce did accept them and they calculated a margin. I have read OMON, so you can show me where wrong, that they didn't reach that issue. That OMON said, OMON definitely said the AFA rate doesn't apply, but it said explicitly we're not reaching the issue of what, how you calculate the rate with or without the information because we're down to a, kind of it's mooped because we're down to a zero percent rate. My understanding is ultimately it was not a facts available decision, but a decision on the merits of the questionnaire responses. Well let's assume we do find that Commerce properly excluded your submission. What's your argument then about why adverse facts is not appropriate? Because if they didn't accept your submission, then you didn't cooperate. You didn't supply the needed information. Why isn't that sufficient to provide an adverse inference? Well, any claim of non-cooperative, in OMON they found the degree of the problem. No, no, no, I'm beyond that. Let's just assume that I think Commerce properly excluded your production because you didn't meet the deadlines and therefore there's, you can't rely on your attempt to meet the deadlines. You didn't meet the deadlines, it was properly excluded, therefore you did not cooperate with the investigation by providing that supplemental information. Why wouldn't adverse facts in the nature here be available then? Because I think the infraction, if there was one, because you know the whole separate issue that we're not discussing now is the questionnaire responses should be accepted, but I think the infraction should be considered not, there was, as said in OMON, here there was no intent not to. Let me ask it a different way. You would agree that a complete refusal to respond to questionnaires or an investigation warrants adverse inferences, right? Yeah, flat-out refusal, but that's not the case here. Well, go with me. If Commerce rejects it because you didn't file on time and that's proper, we determine that that's not an abuse of discretion, then you didn't supply information that they required, right? Why isn't that the same? Why isn't that a basis for adverse inferences? They don't have the information on the record that they required to make a determination of countervailing duties here and so they, they, to encourage parties to comply with their burdens, with their obligation to respond, they impose an adverse inference. This was not an outright refusal. There were best efforts to cooperate to the best of one's ability. There was no refusal to cooperate. There was no concealment. There was an all-out effort to cooperate. So what's the consequence then of refusing to, of not complying with deadlines if they can't say adverse inferences because we don't have the information? I mean it sounds like your view is, well, even if Commerce was okay within their discretion of not accepting this, they still can't do anything about it because we tried, even though we failed. Let's just ratchet up the hypothetical. I know you, your view is it wasn't, wasn't intentional here. Let's assume it was a gross negligence in not getting in on the deadlines. Would that be a basis for AFA? I don't think there's a gross negligence standard. Well, there shouldn't be, but I'm just asking you, would that be enough? You seem to think that, that some kind of attempt to comply, even though you failed to comply and the basis of the hypothetical is, is that Commerce was, was right in excluding it, that that's still can't be the basis for AFA and I'm wondering what the consequences are for Commerce overall if it can't impose AFA when companies fail to supply the documents they requested. Actually, we provided a number of Commerce decisions. You got to live with my hypothetical. Yeah. Let me try this way. Suppose what Oman says is that the AFA rate is, has to be sufficient to deter the failure to cooperate. Here the failure to cooperate seems fairly minor, but I think what Judge Hughes is saying is there's no penalty or no deterrence, which is necessary to deter people from filing late. So, is it possible that in calculating an AFA rate, maybe Commerce can, to some extent, use an AFA rate against you, but only the AFA rate that's necessary to deter the failure to file on time here. In other words, it's not permissible to have a draconian rate of over 150 percent, either in Oman or here, as a deterrent for a minor failure to file, but maybe some partial AFA rate would be appropriate to deter that conduct. Is that a sensible approach here? Is it consistent with what Commerce has done in the past? Well, I think knowing Commerce's AFA approach, which is, if I may say, always draconian, and knowing that, they made their best efforts, there was no slacking of effort, and I think the record shows that. I'm trying to elaborate on what Judge Hughes was asking about. I'm saying, wouldn't it be permissible for them to use a partial AFA rate to deter even a minor failure to file on time, as long as it's proportionate to the, if you call it misconduct, whatever. But here, this draconian large AFA rate for a minor failure to comply seems inappropriate. You know, maybe a total AFA rate is appropriate if there's an entire failure, a deliberate failure to cooperate, but here, there's a minor failure. I'm just trying to ask whether there is, in fact, as Judge Hughes suggested, some remedy here that Commerce can impose in terms of an AFA rate, which doesn't go the whole hog of a draconian large rate, but does something to deter people from filing late. Do you understand what I'm saying? I hope so, actually. Can I insert myself, because I guess if you're not going to respond, maybe I can give you a response. Well, go ahead, if you want to respond, but I think there is a response. I think the purpose of AFA is to encourage cooperation, and in this situation, you know, the possible 160 percent, it doesn't encourage cooperation. It seems disproportionate to what happened here, but what I'm asking is, can't they do something in the way of an AFA rate that's a deterrence, say, an additional 5 percent dumping margin, or something like that? I mean, is that a conceivable remedy here, an approach to this problem? Well, I can see, like, what was said in a lawn fasteners and some other decisions, that you can't go draconian under situations, and so I can see from my rationale, you could go for some reason to delay. Mr. Koenig, you'll have to stop. I started asking a question. That's our precedent on AFA altogether. You can't impose a punitive measure under AFA, right? It has to be designed to remedy the misconduct, and so we look at that under our regular AFA precedent, and determine whether the rate that Commerce selected was an appropriate rate designed to deter misconduct, and if that's too much, then we order them to look at it again. There's already that precedent, right? The answer is yes, there's already that precedent. Here, they looked at it, and they said, the maximum taxes in Kazakhstan are 20 percent, and here are eight possible categories where you could have been given tax-free treatment and gotten a subsidy of 20 percent, and therefore, we're going to impose the AFA rate of 160 percent, because that's the possible subsidy you could be getting under this regime. Let's assume AFA was proper, not on these facts, but you had refused to comply altogether. Would that 160 percent be an appropriate AFA rate? Well, the way to fully describe how the 160 percent was calculated, they said in Kazakhstan, the tax rate on income... Can I just get a yes or no to my question? I don't want to delve into the specifics. Okay, the answer is the 160 percent, no, it's not reasonable under any circumstances. And why is that? If that's equivalent to the subsidy you would have gotten. I know you have an explanation of why that doesn't work under the tax system. It couldn't possibly be the subsidy. Let's assume it was. If it was the subsidy, if Commerce's rationale is correct, I don't want to debate that now, that's one step down from what I'm asking. If Commerce's rationale is correct, and that 160 percent is the subsidy you are getting from Kazakhstan, isn't that an appropriate AFA rate? I mean, you're assuming the conclusion when you ask me that question. Yes, because I'm asking you a hypothetical that these Commerce's calculations represent the actual subsidy. By definition, that's an appropriate AFA rate, because the AFA rate can be the subsidy plus something for insurance, right? Yeah, okay. Can I just follow up a little, and I hope the government, I think the government will agree with what I'm about to say, but I'm not sure, and I hope I'll hear from them. As Oman Fasteners, our opinion in Oman Fasteners points out, there are two separate provisions that apply here when there's a problem or a failure to cooperate. One is A, and the result of that is you use facts available. In other words, you reject the submission as being untimely, but then they use facts available. A more draconian remedy is AFA, which is found in a separate statutory provision, EB. So why, I guess, what is your answer to Judge Hughes that it's not AFA or nothing? That even if there were a problem, at least one would say there's another provision, and I think the government lays this out pretty clearly at page 34 of their brief, that there are two separate ways to deal with problems in timely submissions. One is to take facts available, which means they're going to reject your submission and just use other facts, and the more draconian one is the AFA. So are they, do you agree with me that they're kind of two separate ways to remedy or to deal with an untimely filing? And then there's, of course, the other, which is to just accept it. Do you agree with me? Yeah. Or do you know what I'm talking about? Yeah, I agree with that. All right. Can I ask you one other unrelated question, Judge? I can ask one more question. Yeah. Just, you refer, I think, in your blue brief repeatedly to the fact that, well, Congress did all this stuff because of COVID and extended deadlines or did something with respect to its operations a result of COVID. Am I right about that? And if so, where's the citation for what they did? What did they do in terms of giving themselves more time to deal with matters, etc.? Well, there was a citation in our brief. Actually, across the board, they extended deadlines. For themselves, but not for the parties, or for themselves or for the parties? For themselves as far as preliminary and final decisions. And that's, you have the citation there, and was that extension applicable and alive at the time this was going on? It was during the same time period as far as COVID. It wasn't exactly the same, but it was during that time frame, and we specifically noted in our filing the problems that TKT was having with COVID as far as staff furloughs. Do you have a citation in your brief to that? I didn't know. There was a citation to the rental. And I would add to that. Remember, we have six separate companies that are responding, and the problems, COVID multiplies that problem enormously, because people can't coordinate as easily. They can't go from one company to the next. They can't travel. So it was, well, it's cited in our brief. That was the reason. And we actually requested, for that reason, we requested till September 17, which, if that request had been accepted, then our filing would have been, and this was several days before the September 15 deadline. We requested several days before that, and even before that, that we need to the 17th to meet the deadline. Okay, you've answered my question. I think we're out of time. We'll give you two minutes for rebuttal. Okay. Mr. Jordan. May it please the court. This court should affirm that... So this looks to be perhaps inconsistent with OMON in the sense that OMON says that a minor failure to comply shouldn't result in a draconian AFA rate, and there may be distinctions between this case and OMON. In some ways, this case is more favorable to the importer because they did actually request the extension of time, which didn't happen in OMON, but why is it appropriate to apply for a failure to file a couple of hours late? Why is it appropriate to have this draconian AFA rate? Maybe it's appropriate to have some AFA rate, but to go as far as Commerce did the same penalty that would impose for a total failure to cooperate, that seems wrong, right? So I would first mention that I think there's a continuum, you know, OMON sits on one end and just completely blowing off sits at one end. I would submit that this is a lot closer, given the circumstances of the filing, the fact that it was incomplete, that's another distinction with OMON. A distinction which Commerce specifically declined to rely on. Well, in the preliminary they mentioned that, but in the final they said that this was a supplemental finding. They were making it clear that the... In the final decision they said we're not relying on incompleteness, right? I believe that they said in the preliminary findings that the basis for the rejection was not the completion, but the rejection of the extension that was a circumstance... In the final decision they said we're not relying on incompleteness, right? The incompleteness was not the... was in and of itself... No, they said we're not relying on it at all. And you didn't, you in your brief, you didn't offer that up as an alternative basis for affirmance or anything like that. You treated it as a decide. We treated it as a... one of the many circumstances justifying the Commerce not accepting... As a factor, but not as an alternative basis for affirmance. Can I go back to the discussion we were having with your friend, all three of us were having, which is, tell me if I'm wrong. If somebody does something wrong, forget where we are in the spectrum. There's a range of what Commerce could do. It could grant to the extension. It could find under subsection A facts available and use facts available and reject the submission. And at the other extreme, it could award an AFA payment. Is that the scheme we're dealing with? I mean, because when Judge Dyke refers to a lesser AFA, isn't there a lesser AFA which is facts available? Or am I misreading the statute? I thought that's the way you laid it out actually nicely at page 34 of your brief. I think that characterization is broadly correct. I think in terms of facts available and adverse facts available, there's also a question of what does it mean to apply adversity? You can have facts available and then what's the magnitude of the adversity that applies here? I think one of the things that's complicating here is that there's discussion of it's draconian, but draconian compared to what? What would the rate be? No, I understand. On Oman, how do you read Oman? And do you think Oman applies here? Or do you think the facts are distinguishable? I think the facts are very distinguishable. And I think the AFA issue there where you had a 0 or 1% rate versus 150 some percent rate, the court looked at that and said, given the nature of what went on here, that's draconian. We don't know what the rate would be here, right? Well, I think that goes to the... Without AFA, we don't know what the rate would be. We don't know precisely, partly because they didn't submit all the information. It could be 0. We don't know, right? Well, they did not submit the BPI. That's correct. We don't know, right? We don't know precisely what it would be. We don't know imprecisely. We don't know what the rate would have been. If we agree that Commerce excluded these documents but find that AFA was unavailable and you should have just used available facts or whatever the term is, I've already messed it up. But how would you go about doing that? So you keep out that late submission. What would you then look at? I think that's the challenge because what is available is that 20% rate. But that wouldn't always be the case as a matter of principle. If we knock out, OMON knocks out the AFA rate, let's assume hypothetically that we construe OMON is knocking out the AFA rate and therefore what are we left with in this case? Well, I think what's... Okay, so if we have facts available, adverse facts available, the question then becomes, okay, what sort of lesser than full adversity is there? And really all there is is that 20% rate. In the reply brief, counsel mentions, well, let's speculate that there's some problem. And that's just totally speculative. What is available is that 20%. Well, the 20% doesn't allow any costs. Well, the 20% was based off of the income tax and that's the information they had and that's what was applied. So it's a discretionary... You're saying there's nothing you can do except the draconian penalty because you don't have any other information? I think the question is, does Commerce exercise its discretion reasonably when it looked to that percentage, looked and saw nothing else there and then applied it? Was that a reasonable exercise of discretion? Did Commerce say there wasn't anything else? My recollection is that that was the information... But that may be... I don't know whether that's true in this case or not. I have no idea. But that's not the theoretical standard we apply. Isn't there an assumption based on the statute of language that AFA is more draconian and tougher and larger generally than the facts available remedy? AFA applies adversity to the facts available. So it's a harsher... Can I ask you, if we were hypothetically to decide that OMON applies here, at least to the adverse facts available, the AFA can't apply here? Don't we also have to reach a second question, which is, okay, we've given that in terms of whether Congress acted appropriately in rejecting the information? In other words, another question before us that I don't think was before OMON was before the district court and the CIT court is, should Commerce have granted the extension? Because if we say Commerce erred in not granting the extension, then the submissions come in, and then we're dealing with an entirely different case, right? So isn't that a second issue that has to be dealt with in our case? Assuming we find OMON compels a withdrawal of the AFA, right? I think one big distinction is that even if one does accept that filing, it's still missing the BPI information. Okay, but before we go to that, I'm just asking for what the steps are. What the consequence of the steps, I don't know, and I'm not going to debate. But AFA, assume hypothetically we say it wouldn't apply and these circumstances are close enough to OMON so that AFA doesn't apply. Next step is to say, which also is presented in this case, this is a question, whether or not Commerce acted arbitrarily or whatever standard we use, abused its discretion in rejecting the submissions. Then we have to decide whether the submissions come in at all. And if they come in, that's a different consequence. Isn't this a two-step analysis by us, assuming we get rid of AFA? Yeah, broadly my understanding is you look at the extension and whether Commerce exercises discretion reasonably in saying we're not going to retroactively grant or belatedly accept this. And then the question becomes, okay, do you assign, is the AFA rate, you know, for facts available, I understand counsel to not be disputing facts available. It's really the question of adversity. And so did Commerce rationally exercise? I thought he did. I mean, we could ask him to be sure, but I thought he was complaining about not granting the extension. So I thought even beyond facts available, even if we find AFA doesn't apply in this case, we're still reviewing the arbitrary capriciousness or the whatever standard we use as to whether the extension should have been granted. And that will lead us to an answer, not just for AFA, but whether or not the document should have been excluded. I think that's the first inquiry is what did Commerce rationally exercise discretion there? And then assuming it's rejected, was the exercise to apply the 160 rate based off of AFA rational? And what I'm submitting is, is that the facts available aspect, if we're in that universe where the filing is not accepted, that is not disputed. It's really the adversity, you know, and the adversity, you know, has that incentive to cooperate. So the question is... So you don't think he's rejecting the notion that the filing should have been rejected in its entirety? You don't think he's appealing that? Well, no, assuming that the court agrees with our position that that was properly rejected. And then the question is what rate... Yeah, but that's a question. That's an issue before us. Correct. Oh, okay. All right. So it's a two-step. My step started at FAA and went backwards. You start at the first. Well, if we order you to accept the filing, do we even need to get to the AFA question? If you have to accept the filing, then don't we just send it back until you look at what's on the record and what you have and make a determination from the record including his submission? Because we can't review an AFA filing based on a record that doesn't include his submission because that's not what Commerce based its decision on. I think it would change the nature of a remand of what to consider if that's... If we ordered you to accept the filing. Correct. Because the record before the court... Can I just ask you, I know he's over time, can I ask another question? I mean, OMON seems like it's clearly about mere negligence. What additional... And that seems like an entirely appropriate situation not to apply an adverse inference. Frankly, you should have been ordered to accept the filing there. You've got yourself into trouble with that case by not doing it. But what additional factors would you consider in a late filing situation that would change it from just mere negligence to actual non-cooperation? For instance, would a history of non-cooperation by the party be a factor? I think it's a broad, flexible inquiry and that all goes into... A history of non-cooperation by the attorney representing the party. I think that's one of the factors Commerce can consider. I would point to appendix page 215 where it mentions that inattentiveness, carelessness, and inadequate record keeping can be not meeting best of ability, which is the standard for AFA. So just simply... So this gross negligence or however one wants to frame it can be a basis for finding a failure to cooperate. And then with respect to the specific circumstances, whether or not the rate comparing that to whether it merits the nature of the infraction, I would submit it would. And I would also mention that... So, but why isn't the failure to accept this arbitrary in these circumstances? I mean, just, you know, they asked for a one day extension. They, unlike Oman, they timely filed for the extension. Why is it arbitrary to deny them one day? Because it still wasn't complete after they... But Commerce specifically said they're not relying on that. They're not reaching that question. So you can't offer that as a basis for affirming Commerce. They said we're not addressing that at all. I believe in the IDM with respect to the... Just accept for the moment. Okay. I can show you the place where they say it in the final decision. We don't need to get into it. Let's assume I'm right. They refuse to consider that. You can't rely on that here. Why isn't it arbitrary to deny a one day extension under these circumstances? Well, I think this is the third extension. Commerce has 140 day statutory obligation to determine a rate. They were... This is not the first round, so to speak. They were further in. And Commerce exercised its discretion, said... If this had been the first extension request, would you agree that it would have been arbitrary not to accept the document? I think it would take away one of the reasons I'm offering. But that's a kind of tricky question, isn't it? Because literally, you're right. You granted two extension requests. But if you had granted the first for two weeks, you wouldn't have had the second. You grant... He asks for two weeks. You give them one. And then he comes back and he says, can we get a second week? And you say yes. So technically, that is, I guess, two extension requests. But that was only made necessary because when they came in at first, they asked for two weeks. And you said, no, you can't have two weeks without a rationale. You could only have one week. Am I just correct in laying out the record here? So when one says it was necessary, I think one needs to look at to say, what is the nature of the issue that requires that to be necessary? And I don't think Commerce was all convinced that this was actually necessary. I think they reflected a lack of attentiveness because the only issue, there was a bare bones, one hour before the deadline extension saying technical issues. No, I thought we were talking about the first two extensions. You said they granted two extensions. I was talking about those two extensions. But they were only two extensions because you rejected the first for two weeks. You only gave them one week. And then they had to come in for a second one. So technically, yes, you granted them two extensions. But they had asked for that time in the first extension, which you rejected. I think that should also just serve as an indication to counsel to make sure that things were getting in order if they're only granting them in part. And I think that speaks to the lack of attentiveness. Can I ask you, there's a CIT opinion. I know there are a lot of those. And this isn't binding on us. But it was written a little while ago by Judge Pogue. Grow Best, are you familiar with that? That does not come to mind. OK, well, I'm looking for the standard that the government would articulate, kind of going back to what Judge Hughes was looking at. And I don't think this was AFA. But he concludes by saying, thus, while deferring to commerce's necessary discretion to set and enforce deadlines, the court will review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the department and the interest in finality. Do you view that, the government view that as a correct statement of what the standard ought to be? And I think we mentioned our brief. It's not a bright line factor test. It's a flexible discretionary. No, but you say yes with your first answer, yes. Those factors are among those considered. In the Bebit's case, which was a CIT case, where counsel for TKT was counsel and an eerily similar thing happened. So I think this goes to the past history thing where you look at the Bebit's case and you had a very similar issue. What about the COVID matter? COVID was not cited as a reason for the third extension. It was for the first two. So counsel cannot rely on COVID as such as a basis for what actually happened here. If they got the first two extensions, they would have been timely, right? I'm sorry, can you repeat? If they'd gotten the requested extensions, the first two extensions, they would have been timely because that would have, the extension would have covered this period. Not the first one, the second one. Yes. Well, the first, their request for the extension was 10 days. You only granted half of their extension. So it wouldn't have been, the request covered it. It's just that you cut it in half. The first one, I think, went to September 14th, and we're talking about 15 into 16. But if they granted the second extension through the 17th, they would have been timely, right? It would have been timely, but still incomplete. But still, I'm sorry.  But they're not arguing that your decisions on those first two requests were an abuse of discretion, were they? To the extent they are, the first one, there's no prejudice because it's already, it was to the 14th. But then the second one, they're arguing that that would be a basis there. But I think, given the totality of the circumstances, adding up all, this is very distinguishable from Oman, which was a slight error of 15 minutes. We're talking about repeated error. There's a big difference between 15 minutes and two hours. Both of which are dealing with the filing thing, and they submitted documentation as to the problem they were having in the filing. A very big distinction is the automatic 15 and a half hour extension, where counsel before was ignorant of that policy. So they're worse off here because they asked for an extension instead of just running past the deadline the way they did in Oman? In Oman, if counsel would have filed a very short thing at 4.58 or whatever. The answer is yes, they're worse off because they actually filed for an extension here as opposed to Oman where they didn't? Well, I think it's a circumstance that shows... Answer my question. Are they worse off here because they filed for an extension, whereas in Oman they didn't? They're not worse off because they still blew the deadline after getting the extension. In Oman, if they would have done that automatic 15 hour, they would have gotten it. When would have the deadline been if they hadn't filed the extension request? It would have been... 5 p.m. 5 p.m. on the Friday. On the 15th, yes. And they filed at like 3.30 on Monday. No. So they filed at 3.50 on the 15th, an extension request. No, no, I'm talking about the scenario where they didn't file the extension request. It would be due 5 p.m. They didn't file 15 minutes later after the deadline. Are you talking about Oman? No, here. They filed 70 minutes before the deadline. No, no, take away the automatic extension request. The deadline was Friday at 5. It was September 15th. Is that a Friday? Did it go over the weekend? Or it didn't? I don't... It was September 15th of 2020 at 5 p.m. And then the extension became the next day, September 16th at 8.30 a.m. by operation of the automatic extension. But when did... They didn't file 15 minutes after the deadline, right? Well, in Oman, it was at 5.16 of the same day. I don't think you're understanding what I'm asking. The question was, were they worse off here because they filed the extension request? If they hadn't filed an extension request, when they filed these actual documents was not 15 minutes after the deadline, right? It was the next day. It would have been like 17 hours after the deadlines. But it's automatic. Well, if you incorporate the automatic extension, it's like two hours late approximately. If they didn't do an extension file like in Oman, it would be like 17 hours late. Right, but they did. And that's automatic. So that's not a discretionary thing. Commerce Department didn't have the discretion for that extension. So in terms of what you're defining as they're being late, you're not penalizing them for the time from 5 p.m. to 8.30 a.m. because that extension is automatic, right? So you're not penalizing them for that delay, right? If they would have filed between that time period, I don't think there would be an untimely issue. Answer my question. Do you think in terms of how late they were, they should be penalized in terms of their lateness for the period between 5 p.m. and 8.30 a.m. even though that extension is automatic? I think blowing past two deadlines just increases... Answer my question. I'm talking about this one piece of it. Are you counting against them the fact that they didn't file at 5 p.m. when, as I understand it, that extension is automatic? That wasn't something that Congress had the discretion to reject. So I guess I'm just thinking the time extent, they were late an hour and a half. I don't see how you get 17 hours when you're talking about an extension that was automatic that Congress didn't have the discretion to reject. So here's how I'd frame it. They were late an hour and a half, but the fact that they had this time and didn't take advantage of it, I think, is a factor. There's no showing they didn't take advantage of it. That's not in the record. Well, what's in the record is that there was a hyperlink issue. They attached a document at 3.50 showing that was the only issue. Commerce has help on a page on that saying how you resolve it. In Oman, they resolved the issue. They thought it would take 20 minutes. It took 45. They had 17 hours. I think that's enough of that. Let me ask you a question. Suppose we decide that it was arbitrary and capricious for Commerce to deny them the one-day extension. Let's just assume that, okay? And that under those circumstances, Commerce has to consider the submission. Under those circumstances, can Commerce apply some partial AFA rate to deter the late filing? I think it would be very speculative because the fact is the 20% is there. That's what hypotheticals are. So, if they split the difference, is it just... Now, please answer my question. You seem to be having difficulty answering questions. You understand my question? Let's assume it's arbitrary and capricious to refuse to accept the filing. You have to accept the filing. Can Commerce nonetheless say, because of the failure to file on time, we are to some extent applying an AFA rate? Potentially, if there's a remand for an incomplete submission. How on earth could they apply an AFA if we find that they needed to have granted the extension? That's a given in the scenario, i.e. the extension was granted. How then would it be appropriate in any way, shape, or form to say we're still going to penalize you under AFA? Well, I don't think the AFA case is as strong if those are the circumstances. If we order you to accept the document, then by definition, they've complied with their burden because they completed the production. So, then you would just be looking at facts available if it was insufficient, right? It wouldn't be adverse facts available. If they, if you grant the, if they granted the extension, or I'm sorry, if the extension granted- I just don't understand. I mean, you know, if we decide that it was an abuse of discretion for Commerce not to accept the late filing, then what would be the basis for any AFA determination? That would be, because under that scenario, they would have complied with their obligation because they should have gotten the extension. So, I think it would be very hard. I think you suggest it would be very hard for you to apply an adverse facts available rate. You would have to then just go and look at the record with the production and determine what that showed. So, then if that's, in that universe, there's the failure to supply the BPI information, which is already- No, I know, setting that aside, yeah, yeah, yeah. Yeah, so, and so the question then becomes, if they apply AFA on that basis, it's one less argument we have for that, but it's still somewhat of a failure not to cooperate if they didn't supply that BPI information. Can I- I have one final housekeeping question, which is, what are the original deadlines for the preliminary and the final determinations? And if they were extended by Commerce on its own, what were the nature of those extensions? And if you have record sites, that would be appreciated. So, my understanding is that the investigation began in July 20th of 2020, and they have 140 days under statute to complete that. I am not recalling the preliminary determination at this time. And then, so you're not recalling the preliminary, and then with respect to the final determination? Well, under statute, they have 140 days to reach a final determination. The investigation began- Between the- Between when the investigation's initiated. From July 20th. From July 20th.  140 days under statute. How would one day, a one-day extension, prevent Commerce from meeting those deadlines? You may not like this answer, but I think this comes into the incomplete portion of that, where they would still need more information, and so Commerce has to look at the circumstances and draw a line and say, you know, given what occurred here, you know, we're seeing a failure to cooperate. You keep relying on incompleteness. Commerce, at page 209 of the record, on this decision says, we're not addressing that specifically. At the very bottom of the page, regarding the argument that Commerce may not rely on the incompleteness, we find that this argument is moot. So I think a finding of mootness goes to, you know, again, they did, within the IDM, they did discuss the incompleteness, and I think that was a consideration in the rejection of the extension motion. It wasn't, you are incomplete, and on that basis, as such, you're out. Can I just ask you, I'm still on the dates. July 20th, and the final decision was February 22nd, 2021. There's nowhere close. That's way beyond 140 days, right? Based on my math, that would seem to be beyond 140 days. Way beyond, right? I'm basing that based on my understanding when it started and what the statute says they need to do it. I guess Commerce might have gotten beyond that, but, you know, it has its statutory obligation of when to do it, and- Do you think that had anything to do with the COVID stuff, or you said the COVID stuff didn't affect it? I mean, did, your friend says that they had a four-month lag time or something for COVID. So it's my understanding that Commerce had COVID issues at the time. I wasn't counsel at that time, but my understanding is that there were COVID issues. So I can only speculate as to why- So if there was, in fact, if the time frame between instigation and final determination far exceeded the 140 days, you don't know why that was the case. I can't offer, I can only speculate. I don't know exactly. When Commerce extends, if Commerce goes beyond the 140 days, are they supposed to tell the parties somewhere through the process that that's what's happening, or the parties just wait and get the decision whenever they get the decision? I don't know precisely the procedures at the agency for how to do that. I know their obligation under statute is to do it in 140 days, and if it appears they didn't live up to that, then, you know, I guess that's not ideal. Okay. I think we're done. Thank you, Mr. Jordan. Mr. Koenig, you have two minutes. Oh, I'm sorry, yes. Ms. Smith-Velos. Yes, thank you. Jennifer Smith-Velos on behalf of the Defendant Intervenors, Globe and Specialty Metals, and Mississippi Silicon. I'm gonna start with that last housekeeping question that Judge Post asked. Respectfully, the government's lawyer was incorrect about the timing. The, for, under the regulations, the Congress's original preliminary determination in a CBD investigation is only 65 days, and the full extension, which was done here, is 130 days. I'm sorry, let me just be clear. For the preliminary, you said it's- For the preliminary determination, yes, in a CBD investigation. And so, starting July, and the preliminary determination was November. So that was way beyond the 65 days. That was the full extension to the 130 days, yes. Full extension, what do you mean? The regulation, the statute requires 65, but they can give themselves an extension up to 130 days. Yeah, the statute, yeah, yeah, exactly. But- Well, the statute sets the timeline for the whole investigation. The regulations specify when the prelim is gonna- But wait, is the 140 days up until the preliminary or up until the final? The 130 days is the extended preliminary determination, and then the final determination issues after that. Can you give me a site? Because I'm really not understanding this. So could somebody provide me a site for where this is so I can look at the dates myself? Yeah, unfortunately, I don't know that off the top of my head, but perhaps the Congress lawyer could pass that over to me.  Okay, so just wanted to get that out of the way. And then I wanted to dive into the Oman Fasteners case. I'm very familiar with that because I was involved in that case as well. And while the court didn't come out the way that we had hoped, I do understand the court's concerns, which are not present in this case. First of all, Judge Crow- Not present in this case? Yeah, so it's- That's because there's a big difference between two hours and 15 minutes? Well, the trade court in Oman Fasteners explicitly distinguished that case from this one because on the grounds that TKT's counsel here failed to complete the substantive filing by the 8.30 a.m. deadline, whereas in Oman Fasteners, they would have fallen within the 8.30 a.m. Whereas in Oman Fasteners, they didn't even ask for an extension. Yeah, but if they had, they would have gotten the 8.30. Well, why isn't that a factor which favors the importer here, that they actually asked for an extension, unlike Oman Fasteners, where they didn't? The one factor that's distinguishing here is- No, no, no, answer my question. Yeah, okay. So the commerce explicitly warned TKT that any extension had to actually be granted by commerce in writing before- You're not answering my question. They didn't ask for an extension in Oman. Why isn't this a more favorable case to the importer? Because they did ask for an extension. Because they did ask for an extension, but they did not ask for it at a time for commerce to consider it, and commerce had given them notice that if commerce did not explicitly grant it in writing, then no extension would be given. So they needed to give commerce some time to decide this. So it's not a favorable factor that they actually asked for an extension, whereas in Oman, they didn't. Right, well, yeah, okay, they asked, but they did not ask in the way that they were instructed to do so, and they had voters- Wait, wait, wait, what are you talking about? They asked for an extension consistent with the regulations, right? Yeah, so the questionnaire and the final rule both say that parties should not assume that a last-minute extension will be granted if commerce doesn't have a chance to consider it. I don't think you're answering my question, but go ahead. And how long did it take commerce to reject the extension request in this case? It was in their subsequent letters where they rejected the untimely filing. Yeah, so- But that doesn't answer, my question was, how long did it take commerce to reject the extension request in this case? It was a few days later. A few days, weeks later, wasn't it? I thought it was two weeks later, September 17th to October 1st. Am I wrong about that? That's correct, I think. Yes, so the point is, council knew he was cutting it close, and in fact, all three of the- But he says that best practices suggested you start downloading at a particular time. I forget whether it was 10 or 14, whatever it is. Did they comply with that best practice? I guess they started trying to file before- Did they answer yes? They started trying to file before, yes, but they also then apparently stopped after reaching one single error and getting a bounce back message from Access telling them how to fix it, providing an exact hyperlink to what they needed to do to fix it. Here are all three factors for a particularly strong need to deter noncompliance based on a particularly serious failure to cooperate that are mentioned in Oman Fasteners are met. A particular serious failure to cooperate? This is a particular serious failure to cooperate? Yes, here we have intent. The council knew he was cutting it close. He knew he didn't get the information. Intent to go past the deadline? What's the intent? He knew that he was cutting it close. He had an opportunity to file earlier in the day for Congress to submit it. He had an opportunity to reach out to Congress officials. What's the intent? The fact that he waited until the last minute. There was no intent to go past the deadline, right? Yeah, the fact that he waited until the last minute. There was no intent to go past the deadline, right? I can't say that for sure, but even then, assuming, and then the fact that there was missing information, even assuming the original error there was inadvertent, after we pointed it out, their failure to be forthcoming with it was intentional, and that is not cooperation to the best of their ability. It seems to me that if a respondent understands that they're missing key information, that it would be best cooperation to provide it. Congress did not rely on the incompleteness, right? It is a little frustrating the way that the Issues and Decision Memorandum words when they address the incompleteness argument, and it's a little bit hard to tell for sure, but it seems like it's another factor, but not one that was dispositive in their analysis, but it's certainly an argument. They didn't recite it in the response, right? They didn't refer to it. Appendix 209 or 210. I mean, I don't think there's a dispute that Commerce explicitly declined to rely on the alleged defect as a reason for rejecting the response. If you look at 209 of the records, it says Commerce is continuing to base this determination to reject the initial questionnaire responses untimely based on a lateness of submission rather than the content of the PPI version of the response. Okay, well, that is, you know, the incompleteness of the argument is one that we consistently made, and I think it should inform the Court's analysis. And you didn't rely on it. Well, then, you know, if you feel a remand is necessary just for Commerce to go back and explain that, then that's certainly the case, but, you know, the question had been asked repeatedly, if you accept a submission, what does that get you? It gets you a submission that's incomplete and missing very key information about that's necessary to reach a subsidy analysis. And in absence of that information, the only information, the only rate that's out there is that 20% rate, which not only was... Can I ask you about that? I understand the 20%, and I understand there's all these categories. How does it just work that you multiply that 20% times eight different kind of, I guess, taxes or things? It seems kind of odd. It seems duplicative. Yeah, that's actually a great question, because, so this case is, you know, there's another important distinction between Oman fasteners in this case that's relevant to that. So Oman fasteners was an adverse facts available case, or no, that was an anti-dumping duty case. And in anti-dumping duty cases, you calculate just one weighted average dumping margin based on all the data that's on the record. In a countervailing duty case, it's a program-specific analysis. You're not supposed to look at the aggregate rate, and that's in the POSCO case. And then the program-specific analysis is also reiterated in the statute. Can I just add to this, Chase? You're taking a long time to answer it. Are these eight categories, eight separate types of taxes that they would have been required to pay, and that there's a possible waiver of those taxes on all of those categories, and that's why you multiply it by eight? There are eight different subsidy programs. Not all of them are tax programs. One of them is the corporate income tax program, and that's, they assumed the adverse inference that it was 20%. So every one of those is a potential subsidy? Every one of those is a potentially different subsidy, yes. And every one of the potential subsidy is 20, and that's what you get, or the best information you have for what it could be is 20, so you multiply by eight? The only number was the 20 number for the income tax, and that's why it multiplied. And some of the other programs that aren't income tax may be subsidial in different ways, but we don't know because there's nothing on the record. Exactly, correct. What they argue is that the 20% doesn't take account of the cost, so if they were subject to the income tax, they'd be able to deduct their costs, and they wouldn't be paying a flat 20% amount on revenue, right? It's common standards practice to do this, but basically- No, no, I'm trying to answer my, you're supposed to answer questions. There's no point in your being up there if you don't answer questions. Yeah, I mean, basically, yeah, the- That's what their contention is, that the 20% rate allows for deduction of expenses and that Commerce didn't deduct any expenses in assuming that they got a 20% benefit, right? So the argument, you're saying that they, yeah, that the 20% income tax rate would be a 20% on the revenue and not accounting for taxes, that's your question? On net revenue, it would be 20% on net revenue, but the Commerce calculated it as though there were no expenses. They calculated on gross revenue rather than net revenue, right? Right, but yeah, the problem is we don't have any other information about what the costs and all of that would be- Pretty hard to be in the business without expenses. You're way beyond your time. Do you have the citation yet on the timeliness? All right, so it is, the tariff act, it's section 703B1 is a 65-day, section 703C1, you can postpone the prelim- I'm sorry, you're going too fast. I got the first, what's the second? 703C1, postpone the preliminary determination no later than three days after initiation, no later than 130 days after initiation. Okay. And then the final is 75 days after the prelim, it's aligned with the anti-dumping determination. Is that it? Thank you. All right, I think we're out of time, thank you. Mr. Kernagy, you have two minutes. Actually, in listening, I think there's nothing further for me in rebuttal. I just start going through our brief again and I don't think you want that, so no rebuttal. All right, thank you. Thank you, council, the case is submitted.